IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DONNA S. individually and on behalf of her minor child, AUSTIN S., <br><br> Plaintiff, <br><br> vs. <br><br> STATE OF HAWAII, DEPARTMENT OF EDUCATION, and KATHRYN MATAYOSHI, in her official capacity as Superintendent of Hawaii Public Schools, <br><br> Defendants. | CIVIL NO. 12-00069 JMS-KSC <br><br> ORDER AFFIRMING THE JANUARY 3, 2012 DECISION OF ADMINISTRATIVE HEARINGS OFFICER |

## ORDER AFFIRMING JANUARY 3, 2012 DECISION OF ADMINISTRATIVE HEARINGS OFFICER

## I. **INTRODUCTION**

In this action brought under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), Plaintiff Donna S., on behalf of

her son, Austin S. (collectively, "Donna S."), challenges a January 3, 2012

Administrative Hearings Officer's Findings of Fact, Conclusions of Law, and

Decision (the "January 2012 Decision").  The January 2012 Decision rejected

Donna S.'s arguments that the Defendant State of Hawaii, Department of

Education's ("DOE") May 11, 2011 Individualized Education Program (the "May

11, 2011 IEP") failed to offer Austin S. a Free Appropriate Public Education

("FAPE"). Specifically, the January 2012 Decision rejected that the DOE failed to

offer a FAPE when it deferred discussing Donna S.'s concerns regarding Austin

S.'s transfer from the private school he was attending, Variety School, to a public

school, Jefferson School, until a May 18, 2011 transition meeting. The January

2012 Decision further rejected Donna S.'s argument that the May 11, 2011 IEP's

provision of Extended School Services ("ESY") inappropriately failed to state the

duration of this service.

Based on the following, the court finds that Donna S. failed to show

that the May 11, 2011 IEP did not offer Austin S. a FAPE. The January 2012

Decision is AFFIRMED.

## II. BACKGROUND

### A. Events Leading to the May 11, 2011 IEP

Austin S. is an eleven-year-old boy who is eligible for special

education and related services under the category of specific learning disability.

AR Ex. 9, Jan. 2012 Dec. ¶ 1; Resp. Ex. 5 at 1.[1] Although Austin S. attended his

---

[1] The record consists of several sets of documents. This Order uses the following abbreviations: (1) "AR" refers to the Administrative Record on Appeal (numbered from 1 to 84, with Exhibits 1 to 9); (2) "Pet." refers to Petitioner's Exhibits (numbered from 1 to 67, with Exhibits 1 to 4), where "Petitioner" is Donna S.; (3) "Resp." refers to Respondent's Exhibits (labeled 1 to 286, with Exhibits 1 to 41), where "Respondent" is the DOE; (4) "Tr." refers to

(continued...)

home school, Jefferson School, from August 3, 2009 through March 25, 2010, his

parents unilaterally placed him at the Pacific Autism Center in April 2010, and

then unilaterally placed him at his current school, Variety School, in September

2010.  AR Ex. 9, Jan. 2012 Dec. ¶¶ 3-4; *see also* Tr. at 184-85 (Cheryl Thebeau,

student services coordinator, testifying that the DOE received no prior

communication regarding these transfers).

Pursuant to two separate Settlement Agreements dated October 27,

2010 and April 4, 2011, the DOE agreed to reimburse and/or pay for Austin S.'s

placement at these private schools for certain periods of time.  Resp. Ex. 41 at 280-

86.  The April 4, 2011 Settlement Agreement provides, among other things:

> 2.  The DOE agrees to make direct payments to Variety
> School for the Extended School Year ("ESY") 2011.
> . . .
> 5.  The DOE and Parents will participate in an IEP
> meeting scheduled for April 27, 2011 to review and
> update the current IEP.
>
> 6.  The DOE and Parents will participate in a transfer
> meeting to be held one week after the IEP meeting, but
> no later than the last day of the school year.  Decisions

---

[1](...continued)
transcripts of the November 21-22, 2011 hearing; and (5) "Doc. No." refers to the document
numbers in this court's electronic case file.
    The court outlines only those facts relevant to the issues that the court must address in
resolving this appeal.  Specifically, because the court finds that Donna S. did not show that a
FAPE was denied, the court need not address whether she is entitled to reimbursement and does
not outline the facts relevant to that issue.

for the transfer of student will be made by the team, of
which parents are a part of, most knowledgeable about
the student, which will include Variety School personnel.
. . .

*Id.* at 285.

## B.    The May 11, 2011 IEP Meeting

On April 1, 2011, the DOE sent Plaintiff a letter confirming that the

IEP meeting referenced in the April 4, 2011 Settlement Agreement was scheduled

for April 27, 2011, and that its purpose was "to determine educational placement

and review the IEP's effectiveness/appropriateness in meeting the needs of your

child, review and renew it, if needed."  Resp. Ex. 39 at 224.

The IEP meeting was ultimately held on May 11, 2011.  Resp. Ex. 6.

Cheryl Thebeau, the student services coordinator, testified that the team reviewed

each section of the IEP to determine if Donna S. had any concerns, and that Donna

S. voiced her agreement to each section.  Tr. at 194-95.  Although the team

discussed each section of the IEP, the IEP does not include any statement regarding

transition services and the team did not discuss such services.  Donna S. testified

that when she brought up her concern about transitioning Austin S., she was told

that they would discuss transition at a later date (*i.e.*, the transition meeting

scheduled for May 18, 2011).  Tr. at 47-48, 88.  According to others at the IEP

meeting, however, Donna S. did not raise any concerns regarding the IEP, whether

directed to transition or any other issue. Tr. at 165 (Adele Tomoyasu-Oumi, the

DOE's behavior health specialist); Tr. at 216 (Bruce Watson, speech pathologist).

In relevant part, the IEP states that Austin S. meets the standard for an

Extended School Year ("ESY") and explains the extent to which ESY is necessary

as follows:

> Austin has skills that are now emerging and continues to
> have behavioral needs. In an effort to reacclimate Austin
> back to a DOE school environment and maintain his
> emerging skills, services during the summer ESY period
> will be provided. The DOE is utilizing predictive data to
> make this determination, and the IEP team will
> reconvene prior to the beginning of fall intercession,
> 2011, to determine continued eligibility for ESY. Austin
> will receive 240 minutes per day of special education,
> 120 minutes per day of 1:1 adult supervision, a total of
> 120 minutes of speech/language services, a total of 80
> minutes of occupational therapy, and a total of 120
> minutes of counseling. Services are to address objectives
> in academics, classroom skills and social skills, and will
> be delivered on a DOE school campus.

Resp. Ex. 6 at 47. Even though the ESY states that it will be provided "on a DOE

school campus," pursuant to the April 4, 2011 Settlement Agreement, the DOE

agreed to pay for ESY for the summer 2011 at Variety School. Resp. Ex. 41 at

285. In fact, Austin S. did attend 2011 summer school at Variety, funded by the

DOE.

## C.     The May 18, 2011 Transition Plan Meeting

On May 18, 2011, the transition plan meeting was held in which the team reviewed the plan for Austin S. to transition from Variety School to Jefferson School.  Resp. Ex. 39 at 233.  Carolyn Chang, Austin S.'s former teacher at Jefferson School, testified that Donna S. raised no concerns with any portion of the Transition Plan other than her generalized concern that Austin S. was not ready to be transferred:

> Q.     Can you explain what difficulties were raised with the transition by mom?
> A.     So at the transition meeting we went over it.  We had a draft and we put it on the computer.  We projected it onto the screen and went over section by section. . . . And then each section was gone over with mom.  And we said was this okay.  And mom was like okay.  But at the end -- She seemed okay.  At the end she said oh, no, he's not ready to come back.  It's too soon.  That was all she said.
> Q.     That was it?
> A.     Yeah.  Because we were kind of surprised because every section we went over and we said mom, is this okay, and she said yes.  We also asked for her to provide input.  What do you think about this.  Because it's a team decision.  We cannot unilaterally say this is what we're going to do.  It's all as a team.  Mom was fine with every section.  And then we're at the end, we were kind of taken aback when she said oh, no, it's too soon.  Can you tell us exactly what you would like us to change?  Mom's like no. . . .

Tr. at 125-26; *see also* Tr. at 165 (Ms. Tomayasu-Oumi testifying that Donna S.

raised only the question of the time period for the transition and that she raised no complaints about the transition itself); Tr. at 216 (Mr. Watson providing similar testimony); Tr. at 191 (Ms. Thebeau testifying that Donna S. stated that the transition was too soon); *Cf.* Tr. at 90 (Donna S. testifying that she believed that she expressed her concern that Austin S. would regress if transferred).

To address Donna S.'s concerns that the transition was too soon, the team agreed to weekly meetings. Tr. at 129. Mr. Watson explained the purpose of these meetings:

> We reiterated the team will reconvene to address concerns regarding the transfer. And we were having weekly meetings every Monday, except for the week of July 4th, where we would meet on a Wednesday. At any time if anything came up we could address those concerns. Because if we saw during the transfer plan it was going too quickly or too slowly, we could make adjustments because we were meeting on a weekly basis. If at any time changes needed to be made into the IEP itself, we could convene an IEP because most of the participants were already there at the weekly meetings.

Tr. at 217. The team then reviewed their calendars and scheduled the weekly meetings for dates and times that Donna S. could attend. Tr. at 136.

The final Transition Plan outlines various goals to complete between May 18, 2011 and August 1, 2011 including (1) to reacquaint Austin S. with the DOE campus and personnel (through a video tour and picture book of Jefferson, as

well as visits with Jefferson personnel for increasing durations of time); (2) to transfer Austin S.'s IEP related services from Variety School to DOE personnel (through observation and consultation with providers at Variety School); (3) to have Austin S. familiarize himself with peers and his one-to-one adult support provider; and (4) to provide related services of the IEP goals and objectives. Resp. Ex. 19 at 111-12. The Transition Plan further provides that the "[t]eam will reconvene at anytime to address concerns regarding transfer," and that weekly meetings would be held starting June 6, 2011. *Id*. at 112.

Donna S. testified that she did not agree with this Transition Plan -- she did not want Austin S. to transfer that summer. Tr. at 45. As a result, directly after the transition meeting, Donna S. sent the DOE a May 18, 2011 letter expressing her disagreement with both the transfer itself and the fact that the Transition Plan was not included in the May 11, 2011 IEP:

> Thank you for the transfer meeting this morning I
> expressed that I do not agree to this transfer for my child.
> DOE stated we didn't need a transfer from DOE school
> to PAC or from PAC to Variety School which is untrue.[2]
> I tried to remind you of when my child wondered [sic]

---

[2]  Despite Donna S.'s assertion regarding the lack of previous transition plans, the DOE developed plans for Austin S. to transition between Jefferson School and Pacific Autism Center, as well as between the Pacific Autism Center and Variety School. AR Ex. 9, Jan. 2012 Dec. ¶¶ 5-6.

away from his classes[3] and everyone pretended not to
remember this.  In sum I do not agree to the IEP today
and lastly you stated that the transition is not part of the
IEP it's separate I do not agree that it should be separate.

Resp. Ex. 39 at 233 (punctuation in the original); *see also* Tr. at 86 (Donna S.

testifying that her only complaint with the Transition Plan was that it was not

contained in the IEP).

Donna S. subsequently failed to attend any of the weekly transfer

meetings -- she believed that because the Transition Plan was not part of the IEP it

was "no good," and that Austin S. was scared about returning to Jefferson School.

Tr. at 45.  Although the DOE repeatedly requested Donna S. to attend these

meetings and even offered to hold another IEP meeting for Donna S. to raise her

concerns, *see* Pet. Ex. 3 at 46, she refused on the basis that Austin S. would not

participate in any transfer services because she did not agree to transition him.  Pet.

Ex. 3 at 45-47.  Donna S. testified that it is up to her and her husband to determine

---

3 Donna S. testified that an incident occurred at Jefferson School where Austin S.
disappeared for an hour, and that when she raised this incident during the May 11, 2011 IEP
meeting the participants pretended not to remember it.  Tr. at 47.  Ms. Thebeau testified,
however, that none of the participants had heard of this incident and that such incident was
unlikely given that Austin S. had a one-to-one certified teacher with him at all times.  Tr. at 207.
Donna S. further testified that she alerted the IEP team to this and other incidents at
Jefferson School that resulted in Austin S. not wanting to return.  *See* Tr. at 60-63.  Yet in an
apparent contradiction to this testimony, Donna S. also testified that her only complaint about the
Transition Plan was that it was not part of the IEP.  Tr. at 86.  Given that Donna S.'s subsequent
letters to the DOE only complained about the Transition Plan not being part of the IEP and no
other participants recall Donna S. raising any other complaints, the court finds Donna S. did not
raise these incidents during the May 11, 2011 IEP meeting.

whether Austin S. returns to a DOE school, and that he might be ready to return to a DOE school by next year, but she prefers that it not be Jefferson School. Tr. at 72.

## D.  The July 2011 Decision and the Current Challenge

On August 26, 2011, the DOE received Donna S.'s August 23, 2011 request for a due process hearing alleging that the May 11, 2011 IEP was deficient because:

> 1.      Although a plan to address Student's anticipated difficulties if he were to move from his current program and placement to a different program and placement was deemed appropriate by the DOE, his IEP fails to address this need.
> 2.      Student was offered ESY services on a public campus, but the duration of this services [sic] was not determined.

AR Ex. 1 at 4-5.

The Administrative Hearings Officer held an evidentiary hearing on November 21 and 22, 2011, and issued his decision on January 3, 2012. The January 2012 Decision found that Donna S. failed to show that the May 11, 2011 IEP did not offer Austin S. a FAPE. *Id.* at 14.

On February 2, 2012, Donna S. filed this action seeking review of the January 2012 Decision. Donna S. filed her Opening Brief on July 13, 2012. Doc. No. 17. The DOE filed its Answering Brief on August 13, 2012, and Donna S.

filed no Reply.  A hearing was held on September 10, 2012.

### III.  <u>STANDARD OF REVIEW</u>

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearings officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).

The IDEA provides that the court:

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).  In *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07 (1982), the Supreme Court explained the court's role in reviewing an administrative decision in an IDEA case:

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school

11

authorities which they review. The very importance
which Congress has attached to compliance with certain
procedures in the preparation of an IEP would be
frustrated if a court were permitted simply to set state
decisions at nought. The fact that § [1415(i)] requires
that the reviewing court "receive the records of the [state]
administrative proceedings" carries with it the implied
requirement that due weight shall be given to these
proceedings. And we find nothing in the Act to suggest
that merely because Congress was rather sketchy in
establishing substantive requirements, as opposed to
procedural requirements for the preparation of an IEP, it
intended that reviewing courts should have a free hand to
impose substantive standards of review which cannot be
derived from the Act itself. In short, the statutory
authorization to grant "such relief as the court determines
is appropriate" cannot be read without reference to the
obligations, largely procedural in nature, which are
imposed upon recipient States by Congress.

*See also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 171 (1997)

(citing *Rowley* for the proposition that the IDEA "contemplates deferential review

of state administrative action"). The "fact-intensive nature" of IDEA proceedings

"coupled with considerations of judicial economy render a more deferential

approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104

n.4 (9th Cir. 2007).

The Ninth Circuit has explained that despite this deferential approach,

the court has discretion in reviewing the hearings officer's decision:

The proposition that the courts must give "due
weight" raises the question of how much weight is "due."

We held in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987), that "[h]ow *much* deference to give state educational agencies . . . is a matter for the discretion of the courts." Following a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.*

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful."

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (citations omitted; alterations in original); *see also Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1126 (9th Cir. 2003) ("The 'due weight' to be given is within the discretion of the appellate court." (*superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B))).

Where a hearings officer's decision contains some findings that are "thorough and careful," and others that are not, the court can give deference to the thorough and careful findings and yet review other findings independently. *See R.B., ex rel. F.B.v. Napa Valley Unified School Dist.*, 496 F.3d 932, 943 (9th Cir. 2007) ("[W]e accord particular deference to the [hearings officer's] 'thorough and careful' findings . . . although we independently review the testimony in the record

that [he] failed to consider.").

The burden in this proceeding is on Donna S., as she is the party challenging the administrative ruling. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996) ("As the party challenging the administrative ruling, the School District . . . had the burden of proof in district court.").

## IV. DISCUSSION

In an apparent attempt to salvage claims soundly rejected by the Hearings Officer, Donna S. reframes her arguments as to why Austin S. was denied a FAPE. The court first sets forth the applicable legal framework under the IDEA, and then explains why Donna S.'s arguments, regardless of how she frames them, fail to show that the May 11, 2011 IEP denied Austin S. a FAPE.

## A.    Legal Framework

A basic three-step analysis applies in determining whether a violation of the IDEA denies a qualified disabled student a FAPE.

First, the court asks whether the school district violated the IDEA, either "procedurally" or "substantively." *Rowley*, 458 U.S. at 206-07. A school district may violate the IDEA's statutory or regulatory procedures in creating or implementing (or failing to create or implement) an IEP. *Id.* Or a school district

14

may violate the IDEA substantively by offering an IEP that is not reasonably calculated to enable the child to receive educational benefit. *Id.* The school district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 433 (9th Cir. 2010) (quoting *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).

Second, if the court finds a violation of the IDEA's procedures, the court then addresses whether that violation denied that student a FAPE -- for not all procedural violations are actionable. *See, e.g.*, *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009); 20 U.S.C. § 1415(f)(3)(E)(ii).[4] The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909 (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992)). That is,

---

[4] Section 1415(f)(3)(E)(ii) provides:

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--
> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

"where a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE." *Napa Valley Unified Sch. Dist.*, 496 F.3d at 938 n.4 (citation omitted).

The third stage is the remedy -- and this stage itself includes several steps. If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Such relief could include reimbursement for a private placement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985). The parent or guardian, however, must also establish that the particular private placement is itself "appropriate." *See, e.g.*, *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009).

**B.    Application**

**1.    *Failure to Address Transition Plan During May 11, 2011 IEP Meeting***

In her request for due process hearing before the Hearings Officer, Donna S. asserted that the May 11, 2011 IEP failed to address Austin S.'s transition needs, *i.e.*, that the IEP did not include the Transition Plan. AR Ex. 1 (stating the issue as "[a]lthough a plan to address Student's anticipated difficulties if he were to move from his current program and placement to a different program and placement

16

was deemed appropriate by the DOE, his IEP fails to address this need); *see also* Tr. at 7-8 (counsel for Donna S. explaining that the issue presented is that Austin S.'s transition plan was not made part of the IEP). Despite framing the issue before the Hearings Officer as an alleged denial of FAPE due to the IEP's failure to include a transition plan, Donna S. now disavows that this is the issue she is raising on appeal. Indeed, Donna S.'s Opening Brief asserts, "Petitioners have <u>not</u> alleged that the IEP should have contained a transition plan. Instead, Petitioners have alleged that the IEP is deficient as it ***fails to address Parents' concerns*** relating to a disruption in Student's program." Doc. No. 17 at 4.

Donna S. makes this about-face for good reason -- several courts in this district, including this court, have already found that the IDEA does not require an IEP to address transition services except under a limited set of circumstances not applicable to this action.[5] *See Carrie I. ex rel. Greg I. v. Dep't of Educ.*, --- F. Supp. 2d ----, 2012 WL 2353850, at *13 n.16, *15 n.17 (D. Haw.

---

[5] For example, an IEP must address transition services for children age sixteen and above to assist them in reaching "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); *see also* 20 U.S.C. § 1401(34) (defining "transition services" as a "results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation").

May 31, 2012) (explaining that a claim based on an IEP's lack of a transition plan fails as a matter of law); *Dep't of Educ., Hawaii v. C.B. ex rel. Donna B.*, 2012 WL 1537454, at *5 (D. Haw. May 1, 2012) (Judge Susan Oki Mollway) ("[A]s previously stated by this court, the DOE is not required to include a transition plan in an IEP whenever a child moves from a private institution to a public school." (citing *L.I. v. Hawaii, Dep't of Educ.*, 2011 WL 6002623, at *6 (D. Haw. Nov. 30, 2011)); *James M. ex rel. Sherry M. v. Hawaii*, 803 F. Supp. 2d 1150, 1164 (D. Haw. 2011) (Judge Leslie E. Kobayashi) ("This Court has previously held that while 'the IDEA requires an IEP to have a statement of needed transition services in some circumstances, the statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place.'" (quoting *L.M. v. Dep't of Educ.*, 2006 WL 2331031, *16 (D. Haw. 2006)); *see also E.Z.-L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 598 (S.D.N.Y. 2011) ("[T]here is no requirement in the IDEA for a 'transition plan' when a student moves from one school to another."); *Cf. Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) ("The absence of IEP provisions addressing transition . . . issues does not, standing alone, violate the IDEA or deprive the disabled child of a FAPE.").

As explained by *C.B. ex rel. Donna B.*, the IDEA, 20 U.S.C.

§ 1414(d)(1)(A)(i), "clearly requires an IEP to include a number of matters, such as a statement of the child's present level of achievement and measurable goals." 2012 WL 1537454, at *5. Nowhere in these stated requirements does the IDEA provide "that an IEP include a transition plan when a child moves from a private facility to a public school." *Id.* Given that the IDEA explicitly provides that section outlining the requirements of an IEP shall not "be construed to require . . . that additional information be included in a child's IEP beyond what is explicitly required in this section," 20 U.S.C. § 1414(d)(1)(A)(ii), this omission is meaningful -- a transition plan is not required to be a part of an IEP. *Id.* This persuasive caselaw fully undermines any argument that Donna S. could make (and made before the Hearings Officer) that the May 11, 2011 IEP is insufficient for failing to include a transition plan.

In light of this law, Donna S. now attempts to reframe her argument as a failure of the DOE to discuss her concerns about a disruption in Austin S.'s program. Her argument, however, is based on a false premise -- there is no evidence that Donna S. ever articulated such concern during the May 11, 2011 IEP meeting. Indeed, the only evidence cited by Donna S. for the proposition that "Student's mother wanted to discuss her concerns about a disruption in her son's program at an IEP meeting" is the May 18, 2011 letter Donna S. wrote *after* both

the May 11, 2011 IEP meeting and the May 18, 2011 transition meeting. Doc. No.

17, Pet. Mot. at 4. And Donna S.'s own testimony refutes that she raised concerns

about a disruption in Austin S.'s program -- Donna S. testified that at the May 11,

2011 IEP meeting she raised the issue of transition needs (as opposed to disruption

of services, support services, etc.) and was told that they would discuss transition

at the May 18, 2011 transition meeting. Tr. at 47-48, 88. When asked what

specific needs she attempted to raise at the May 11, 2011 IEP meeting, she could

not recall. *Id.* at 89.

As a result, to the extent Donna S. argues that she was prevented from

discussing her concerns about a disruption in Austin S.'s program, Donna S. has

completely failed to carry her burden of establishing a denial of a FAPE on this

basis. *See Schaffer ex rel. Schaffer*, 546 U.S. at 62. And in light of the concerns

that Donna S. actually raised at the May 11, 2011 IEP meeting, Donna S.'s

argument boils down to a complaint that transition services were not discussed at

the May 11, 2011 IEP meeting. It naturally follows, however, that where an IEP

need not discuss transition, this topic need not be discussed at the IEP meeting

itself. Specifically, the court recognizes that the IDEA requires that an IEP be

"designed to meet [childrens'] unique needs and prepare them for further

education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A). But

*C.B. ex rel. Donna B.* explains that even where a child may require transition

services, the IEP is necessarily limited by 20 U.S.C. § 1414(d)(1)(A)(ii) providing

that no additional information shall be included in a child's IEP beyond what is

explicitly required in that section. Otherwise, the scope of an IEP is potentially

limitless:

> Of course, the IDEA does indeed require the DOE to
> address the unique needs of a child, and a child may well
> have transition needs. The Eighth Circuit in *Park Hill*
> even stated that a failure to address transition needs
> might at most constitute a procedural violation of the
> IDEA. But to the extent § 1414 bars requiring an IEP to
> include information not expressly required by law,
> requiring a transition plan in an IEP would be an end-run
> around that bar. If that bar and the "unique needs"
> provision are to be read as compatible, it appears to this
> court that the IDEA must be read as addressing a child's
> unique needs in the areas that the IDEA requires an IEP
> to address. Otherwise, a particular child's "unique
> needs" could eliminate any limit to the scope of an IEP.

*Id.* at *7.

The court finds this reasoning persuasive. The IDEA requires that an

IEP address a comprehensive set of items directed to outlining the child's present

levels of performance, goals for the year, and services that will assist the child in

reaching those goals. *See* 20 U.S.C. § 1414(d)(1)(A). As explained by Mr.

Watson, the IEP and Transition Plan are directed to different, yet complementary

goals:

From my understanding of it is that an IEP is a proposed
plan for a proposed place this is what the child needs.
And so the transfer plan that we create is kind of an
addendum. Because sometimes when you're moving a
child from point A to point B things change. And it's
kind of a bridge between the two. The IEP is good at
school A, the IEP would be good at school B. But
something in the middle might need to take place,
additional services, additional supports to smoothly
transition a student from A to B.

Tr. at 221-22. Given these differences, it makes sense that an IEP would not

include discussion of transition services -- a transition plan governs the discrete

issue of transferring a student from one school to another, while an IEP outlines

yearly goals for a student. Given this differing scope and issue, it also makes sense

that an IEP team would defer discussing transition services so that they can focus

on the necessary parts of the IEP. The court therefore finds that Donna S. has not

shown that Austin S. was denied a FAPE when the IEP team deferred discussing

transition until the May 18, 2011 transition meeting.

The court further finds, however, that even if the IEP team failed to

discuss transition needs at the May 11, 2011 IEP meeting, this procedural IDEA[6]

---

[6] The IDEA provides that "[i]n developing each child's IEP, the IEP Team . . . shall
consider . . . the concerns of the parents for enhancing the education of their child." 20 U.S.C.
§ 1414(d)(3)(A)(ii); *see also M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 649 (9th Cir. 2004)
("The Act imposes upon the school district the duty to conduct a meaningful meeting *with* the
appropriate parties." (quotations and emphasis omitted)); *B.B. ex rel. J.B. v. Hawaii, Dep't of
Educ.*, 483 F. Supp. 2d 1042, 1051 (D. Haw. 2006) ("[T]he IDEA requires that parents be
(continued...)

violation was not a denial of a FAPE. Donna S. does not argue that there was any substantive deficiency in the May 18, 2011 Transition Plan; rather, she argues only that she was denied a FAPE where the transition was not discussed at the May 11, 2011 IEP meeting and incorporated into the IEP. But this argument ignores that the transition was fully discussed at the May 18, 2011 meeting, with weekly meetings to follow. As a result, Donna S. had a full and fair opportunity to discuss her concerns regarding transition; there was no loss of educational opportunity or infringement on Donna S.'s opportunity to participate in the IEP formulation process. *See Capistrano Unified Sch. Dist.*, 556 F.3d at 909.

In sum, Donna S. failed to carry her burden of establishing a denial of a FAPE based on the DOE's alleged refusal to address her concerns about disrupting Austin S.'s program -- there is no evidence that she even voiced this concern at the May 11, 2011 IEP meeting. Rather, the evidence establishes, at most, that Donna S. complained that her request to discuss transition was deferred until the next week's meeting. Because a failure to discuss transition, on its own, does not amount to a denial of FAPE, the court AFFIRMS the January 2012 Decision.

---

[6](...continued)
afforded an opportunity to participate in the IEP process and requires the IEP team to consider parental suggestions.").

### 2.    *Failure to Provide the Location of ESY Services*

Like her arguments regarding transition, Donna S.'s argument regarding ESY services have been a moving target.  Before the Hearings Officer, Donna S. argued that Austin S. was denied a FAPE because the May 11, 2011 IEP failed to provide the *duration* of the ESY services.  AR Ex. 1 at 4-5.  Donna S. now argues that the May 11, 2011 IEP fails to describe the *location* for Austin S.'s ESY services as required by 20 U.S.C. § 1414(d)(1)(A) and (d)(6).  Doc. No. 17, Pet. Br. at 8.  The court rejects this argument.

"The IDEA requires a clear written offer that sets forth a sufficiently specific statement of what the actual offered services will be."  *Hailey M. ex rel. Melinda B. v. Matayoshi*, 2011 WL 3957206, at *20 (D. Haw. Sept. 7, 2011) (quoting *A.B. v. San Francisco Unified Sch. Dist.*, 2008 WL 4773417, at *15 (N.D. Cal. Oct. 30, 2008)).  The IEP's offer of services must include "a statement of the anticipated frequency, location and duration, as well as sufficient information so that the level of the district's commitment of resources is clear . . . ."  *Id.*; *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (stating that an IEP must include the "the anticipated frequency, location, and duration of those services and modifications").

Pursuant to the April 4, 2011 Settlement Agreement, the DOE agreed

to pay for ESY services for summer 2011 at Variety. *See* Resp. Ex. 41 at 280-86

(stating that "The DOE agrees to make direct payments to Variety School for the

Extended School Year ('ESY') 2011"); *see also* Resp. Ex. 11 at 62 (May 18, 2011

Prior Written Notice stating that "DOE continues to believe that this IEP can be

implemented on a DOE school campus. However, per the settlement agreement

signed on 5/3/11, DOE has agreed to pay for placement at the current private

school for the second semester of school year 2010-11 and summer ESY."). As a

result, Donna S. received exactly what she wanted -- for Austin S. to receive

services over the summer at Variety -- such that she can hardly argue that a FAPE

was denied.

When confronted with these facts at the September 10, 2012 hearing,

Donna S. abandoned her argument that the IEP failed to describe the placement of

ESY services and instead argued that the ESY failed to adequately discuss the least

restrictive environment appropriate for Austin S, and failed to outline ESY services

for a full year. The court will not address arguments raised for the first time in a

Reply, much less at a hearing. *See, e.g.*, *Hi-Tech Rockfall Const., Inc. v. Cnty. of

Maui*, 2009 WL 529096, at *18 n.9 (D. Haw. Feb. 26, 2009) ("Local Rule 7.4

provides that '[a]ny arguments raised for the first time in the reply shall be

disregarded.'"); *Coos Cnty. v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008)

(declining to consider an argument raised for the first time in a reply brief).

And to the extent that Donna S.'s argument at the September 10, 2012 hearing once again focused on the duration of ESY services, such argument fails in light of the record evidence. The May 11, 2011 IEP plainly provided that ESY services were for the summer 2011 and that "the IEP team will reconvene prior to the beginning of fall intercession, 2011, to determine continued eligibility for ESY." Resp. Ex. 6 at 47. This subsequent IEP meeting was scheduled and held in September 2011. *See* AR Ex. 9, Jan. 2012 Dec. at 13.

The court therefore AFFIRMS the Hearing Officer's determination that Donna S. failed to show that she was denied a FAPE in the provision of ESY services.

## V. <u>CONCLUSION</u>

The January 3, 2012 Findings of Fact, Conclusions of Law, and Decision of the Hearings Officer is AFFIRMED. Because the court affirms the January 2012 Decision that Austin S. was offered a FAPE, the court DENIES Donna S.'s request for reimbursement. *See* Doc. No. 17, Pls.' Opening Br. at 12 (arguing that Donna S. may be awarded reimbursement if she establishes that the DOE violated the IDEA). The Clerk of Court shall enter judgment in favor of Defendant Department of Education, State of Hawaii and against Donna S,

individually and on behalf of her minor child, Austin S.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 11, 2012.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Donna S. v. State of Hawaii et al.*, Civ. No. 12-00069 JMS-KSC, Order Affirming the January 3, 2012 Decision of Administrative Hearings Officer